IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR  22–13–M–DLC |
| Plaintiff, | |
| vs. | ORDER |
| MIGUEL ANGEL MEDINA, | |
| Defendant. | |

Before the Court is Defendant Miguel Angel Medina's Motion for Judgment of Acquittal and/or New Trial.  (Doc. 127.)  The motion requests a judgment of acquittal on counts 1 and 3 of the indictment, pursuant to Rule 29 of the Federal Rules of Criminal Procedure, and/or a new trial on count 1 and/or count 3 of the indictment, pursuant to Rule 33, and any other relief the Court may find appropriate. (*Id.* at 2.)  For the reasons set forth herein, the motion for judgment of acquittal will be granted as to count 1 and denied as to count 3, and the motion for a new trial will be denied.

## FACTS AND BACKGROUND

On January 21, 2022, Mr. Medina and Leslie Patricia Rivera were charged by criminal complaint with illegal transport of aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii), and conspiracy to transport aliens, in violation of 8 U.S.C.

1

§ 1324(a)(1)(A)(v)(I).  (Doc. 1.)  They were subsequently indicted on February 17, 2022, and charged with conspiracy to transport illegal aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I) and 1324(a)(1)(A)(ii) (Count 1), and transportation of illegal aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and 18 U.S.C. § 2 (Counts 2 (Rivera) and 3 (Medina)).  (Doc. 36.)

After the Court denied Defendants' motion to suppress and motion to sever, trial was set to begin at 9:00 a.m. on August 22, 2022.  (Doc. 75.)  On the Friday afternoon before trial, Ms. Rivera filed a motion to vacate trial and set a change of plea hearing, stating that Ms. Rivera had accepted a plea agreement offered by the United States.  (Doc. 92.)  The Court set a change of plea hearing at 8:00 a.m. on August 22 but did not vacate the trial setting.  (Doc. 94.)

At Ms. Rivera's change of plea hearing, the United States presented the following summary of the offer of proof against Ms. Rivera:

> On January 19 of this year, Leslie Patricia Rivera and Miguel Angel Medina picked up six illegal aliens who had crossed -- who had just crossed the international border from Canada at a place that was not a port of entry.
>
> Game cameras caught the illegal crossers.  Rivera and Medina left the Seattle area in a rental car the day prior and drove straight through, with a stop for sleep, but not at a hotel.
>
> Rivera's friend, Victor Gabriel, offered her $3,500 to pick up four people and drive them back to Seattle.  Gabriel entered the GPS location into her phone.  And she was paid $1,000 in advance for the rental car, food, and travel expenses, and then she offered to pay Medina $1,000 to accompany her on the drive.
>
> Upon the delivery of the people, the aliens, the four people she was picking up to the Seattle area, she would receive the remainder of

the money, or the other $2,500.

The Offer of Proof, then, contains more specifics regarding the 5:00 a.m. to 6:00 a.m. traffic stop of the rental car that Rivera was driving. In all, there were six people in the two back seats of the vehicle that was stopped by Border Patrol, driven by Rivera. Medina was the front-seat passenger, and then there were six Mexican nationals in the two back seats.

They were all taken to the Eureka Border Patrol station for processing, where the majority of the Mexican nationals, who all acknowledged that they were in the United States illegally after walking across the border, paid various amounts of money to be smuggled into the United States. That the amounts ranged from approximately $1,000, all the way up to just over $7,000, to be smuggled into the United States.

Ms. Rivera was read her Miranda rights, and waived those rights. She admitted that she was in the United States legally, as a legal permanent resident. She was instructed by her friend to travel from Seattle to the Eureka area to pick up people. He entered that location into her phone GPS, and that she was going to pay Mr. Medina $1,000 to ride with her.

And that the total amount of money she was receiving for transporting these folks from Montana back to Seattle was a total of $3,500.

(Doc. 108 at 40–42.) At first, Ms. Rivera agreed with the United States' offer of proof except to note that the six people Ms. Rivera picked up did not pay her any money directly. (*Id.* at 42–43.) But then, she stated, "I didn't know that they were illegally -- I didn't know they were illegals." (*Id.* at 43.) The Court expressed concern that Ms. Rivera was not admitting to actually drawing the inference that the aliens were in the United States illegally, as required to prove the mental state necessary for a conviction under count 2. (*Id.*) The government highlighted additional facts in the offer of proof, including that Ms. Rivera picked up the aliens

"in the middle of nowhere" and that when a border patrol agent was trying to talk to the aliens in the back seat, Ms. Rivera attempted to answer for them and have them not speak to the border patrol agent. (*Id.* at 43–44.) The Court noted, "I don't disagree that a very reasonable inference is that they were coming over the border illegally. My issue is the second part of that is that she actually drew or draws that inference, and it sounds to me like she's not." (*Id.* at 44.)

Ms. Rivera's counsel had a discussion with her off the record and then asked her questions on the record, telling her that he wanted her "to answer truthfully" and reminding her that "part of the knowing and voluntary analysis really is making sure that this is what you want to do, and that you're doing it knowing what you're pleading guilty to and -- and agreeing that you did it. . . . I'm not trying to force you into saying or doing anything that you don't believe to be true, okay?" (*Id.* at 45.) Ms. Rivera responded, "Yes." (*Id.*) After several questions, the Court called counsel to sidebar and expressed concern that "somebody looking at this transcript" would not understand Ms. Rivera's plea to be knowing and voluntary. (*Id.* at 48–49.) After another off-the-record discussion between Ms. Rivera and her counsel, her attorney asked the following:

> MR. MCKEON: Ms. Rivera, when you picked up these individuals, you did not know at the time, when you pick them up, that they were illegal, correct?
>
> THE DEFENDANT: Yes.

MR. MCKEON: But, uhm, after time with them in the vehicle, you can understand, and you did understand and come to understand, that these individuals were not here legally in the United States, correct?

THE DEFENDANT: Yes.

(*Id.* at 50.)  The Court thereafter found that Ms. Rivera's decision to change her plea to guilty on count 2 was knowing and voluntary and recommended that the undersigned accept her plea of guilty.  (*Id.* at 51–52.)

The Court held Mr. Medina's final pretrial conference immediately after Ms. Rivera's change of plea hearing concluded, vacated Ms. Rivera's trial, and the United States and Mr. Medina proceeded to trial on counts 1 and 3.

Nathan Albertson, a U.S. Border Patrol agent, testified first.  (Doc. 125 at 52.) He testified that at approximately 5:02 a.m. on January 19, 2022, he received a phone call from Border Patrol dispatch, Spokane Sector, and the dispatcher informed him that a camera activation indicated that individuals appeared to be attempting to cross the U.S. border illegally on foot near Lake Koocanusa, in an area known locally as West Kootenai.  (*Id.* at 56–57.)  He put on his uniform, placed his equipment in his vehicle, notified his supervisors and coworkers of the dispatcher's information, and drove toward West Kootenai.  (*Id.* at 57.)  He testified that there was not a port of entry or other legal point to enter the United States in that area.  (*Id.* at 58.)  He testified that road conditions became icy after crossing the Koocanusa Bridge, and at that time, he returned to cell phone service and Spokane Sector dispatch informed

him that more camera activations indicated that approximately six to nine people were involved, and three or four of them might be females or teenagers because of their smaller stature.  (*Id.* at 58–59.)

At approximately 5:45 a.m., Agent Albertson encountered a vehicle capable of carrying that many people, a gray crossover SUV with Washington plates, which approached an intersection from the West Kootenai Road, which parallels the Canadian border.  (*Id.* at 59–60.)  He testified that he did not see any other traffic after he crossed the bridge, and typically there would not be much local traffic in this remote area on an early Wednesday morning in January, and typical traffic would have been cars with local license plates and one to two passengers.  (*Id.*)  Agent Albertson began following the SUV, and he observed three to four passengers and condensation on the windows of the car.  (*Id.* at 60–62.)  He activated his emergency lights and pulled the vehicle over approximately 5 to 10 miles from the border.  (*Id.* at 62.)

Agent Albertson approached the driver side of the SUV and identified himself as a Border Patrol agent.  (*Id.* at 63.)  He testified that Ms. Rivera was the driver, and she told him they were coming from New York, but then said, "Well, we're going to New York.  My GPS is broken."  (*Id.*)  She provided her legal permanent residency card and stated she was from Honduras.  (*Id.*)  Mr. Medina was identified as the man sitting in the passenger seat, and he stated that he also was a Honduran

citizen and was a legal permanent resident in the United States, but he left his immigration documents in Seattle.  (*Id.* at 63–64.)  Agent Albertson asked Mr. Medina whether he had crossed the border that morning between the U.S. and Canada, and Mr. Medina replied "[y]es," but later recanted that statement, saying he did not understand what Agent Albertson had said.  (*Id.* at 64.)  Agent Albertson testified that he first began speaking with Mr. Medina in English because "[o]riginally it appeared that he understood the English language quite well," but later, "he started speaking in Spanish and telling me he didn't understand what I was saying, and so I reverted to Spanish."  (*Id.* at 88.)

Agent Albertson then asked Ms. Rivera to roll down the rear passenger window, and he observed six people—four women and two men—in the two back rows of seats.  (*Id.* at 64.)  He testified that they were "slouched down in the seat" with their heads "slumped forward and their eyes closed."  (*Id.*)  First in English, and then in Spanish, Agent Albertson asked them to wake up; when they woke up, he asked them where their country of citizenship was, and they stated "Mexico" and provided Mexican passports.  (*Id.* at 64–65.)  He ran "some records checks," and while waiting for those to return, he tried to talk to the six passengers, but he "was having some difficulties . . . because the driver at that time kept trying to answer for them and was speaking in a low tone of voice that I couldn't understand or hear, and I asked her several times to be quiet."  (*Id.* at 65–66.)

7

At approximately 6:05 a.m., another Border Patrol agent, Agent Berg, arrived, and Agent Albertson took that opportunity to escort Ms. Rivera to his vehicle so he could speak to the passengers without interruption.  (*Id.* at 66.)  They denied crossing the border.  (*Id.*)  Agent Bates then arrived, and Agent Albertson escorted Mr. Medina to Agent Bates's vehicle.  (*Id.*)  Agent Albertson resumed talking to the passengers and asked one passenger "that was a little on the hesitant side about answering some of the questions" to step out of the SUV; once they were speaking outside, this passenger admitted he was in the country illegally.  (*Id.* at 66–67.) Agent Albertson then told the remaining passengers that he had admitted to being in the country illegally and asked whether they were also in the country illegally, and all five of the other passengers nodded and said yes.  (*Id.* at 67.)

While waiting for additional vehicles to arrive to assist in transporting the SUV's passengers, Ms. Rivera told Agent Albertson "she had been contacted to pick up the six passengers . . . in Libby, Montana," which was approximately 70 miles from where the car had been stopped, but she denied picking them up in the West Kootenai.  (*Id.* at 68.)  Border Patrol agents told Ms. Rivera and Mr. Medina that they were being arrested for alien smuggling and transported them to the Eureka border patrol station.  (*Id.* at 69.)

Next, the United States called five of the six Mexican citizen passengers as witnesses and played the deposition of the sixth; they testified that they entered the

United States illegally from Canada by walking across the border with a guide. (*Id.* at 96–141; Doc. 126 at 6–22.) One passenger testified that Ms. Rivera told the passengers to turn off their cell phones. (Doc. 125 at 119, 122.) Another passenger testified that Ms. Rivera told the group to "get in and to be at ease, quiet" and Mr. Medina "didn't hardly speak at all." (*Id.* at 132–33.)

The United States also called Seth Oppelt, a Border Patrol agent working in the intelligence department in the Spokane Sector. (Doc. 126 at 22.) He was instructed to interview Ms. Rivera, Mr. Medina, and the six passengers. (*Id.* at 23–24.) Agent Oppelt testified that the majority of his interview of Mr. Medina was in English, but agents spoke to him in Spanish when he would not understand their questions. (*Id.* at 24–25.) He testified that he did not learn "a lot" from his interview with Mr. Medina, who stated "basically . . . that he was along for a ride with a lifelong friend that he even knew in Honduras . . . and that she asked him to go along on a ride to explore Yakima, Washington." (*Id.* at 25.) Agent Oppelt asked Mr. Medina whether he asked Ms. Rivera about the change to their travel plans, because Yakima was approximately a two-and-a-half-hour drive from Tacoma, while Yakima to West Kootenai was an additional seven-hour drive. (*Id.*) According to Agent Oppelt, Mr. Medina responded that he "didn't find that curious or suspicious in any way that it was a much longer duration of a drive" and did not ask her any questions. (*Id.* at 25–26.) Mr. Medina spoke to him about going to Yakima and

9

taking a nap along the way, but he "never mentioned anything about the people [that were picked up] or that he discussed that with the driver or any, anything as it applies to people getting in the car." (*Id.* at 26.) On cross-examination, Agent Oppelt acknowledged that although he used a recording device while interviewing Ms. Rivera, he did not use it while interviewing Mr. Medina. (*Id.* at 41–42.) Counsel for Mr. Medina also elicited that Agent Oppelt's report stated that Mr. Medina said he received a text message from Ms. Rivera offering him a way to make some money, but Agent Oppelt did not know whether any such text message was found on Mr. Medina's phone. (*Id.* at 43–44.)

The United States then called Ms. Rivera. (*Id.* at 51.) The first time the United States asked, "did you enter a guilty plea to transporting illegal aliens?" Ms. Rivera responded, "They were in the car with me, yeah." (*Id.* at 52.) The government immediately asked again, "And did you enter your guilty plea before another judge yesterday morning?" and Ms. Rivera responded "Yes, because I had them in the car." (*Id.*) Counsel for the government moved on to the circumstances of the offense. Ms. Rivera explained that she placed a classified ad in Seattle that she provides rides in addition to driving for Uber, and she "was hired to pick up four people from national park, Montana." (*Id.* at 53.) She testified that she was going to be paid $3,500 when "we arrived with the people in Seattle" and was paid $1,000 up-front for expenses of renting a car, gas, and food. (*Id.*) She said that she was

hired by a man named Victor, who told her to go to Montana to pick up a family who was coming from New York.  (*Id.* at 54.)  She denied knowing him before he called her to request the ride, and he put the address of the pickup spot into her phone the day before the pickup.  (*Id.* at 54–55.)

Ms. Rivera testified that she took Mr. Medina to Montana with her "[b]ecause, you know, I was alone, I'm a woman, and I thought, well, just in case maybe a tire blows up or something is wrong with the car.  That's why I asked him if he could come with me."  (*Id.* at 54–55.)  She testified that while they were on the way, she said, "'I'm gonna give you as a gift like $500 or something,' I said, 'as a gift.'"  (*Id.* at 55.)  When asked directly whether she was going to pay Mr. Medina $1,000 to travel with her, she answered, "Pay him, no.  Give as a gift."  (*Id.*)  She testified that Mr. Medina is her daughter's godfather and that he does not work.  (*Id.* at 56.)  She denied telling Mr. Medina that they were going to Yakima and instead testified that she told him they were going to "do a trip" to Montana and that "he should come with me in case a tire blew up or something was wrong with the car."  (*Id.* at 56–57.)

Ms. Rivera testified that when they arrived at the pickup point around 4:45 a.m., it was dark and there was "a lot of ice on the roads."  (*Id.* at 57–58.)  She testified that when people approached the car, they asked her in Spanish whether she was the driver, and she asked whether they were the people coming from New York;

when they responded yes, she said "I'm picking you up.  Let's go."  (*Id.* at 58–59.)

When she realized she was picking up six people, she asked, "'Isn't it just gonna be

four?'  And they said, 'No, there's two more.'"  (*Id.* at 59.)  Otherwise, she testified

that she did not talk to them at all.  (*Id.* at 60.)  She testified that Mr. Medina did not

drive because he told her "that his license was suspended or wasn't working or

something.  I didn't understand real well, but that's why I didn't have him drive."

(*Id.* at 60–61.)  She testified that he was supposed to drive, "but since he didn't have

-- had an issue with his license, I didn't want him to do that because, you know,

that's a crime."  (*Id.* at 61.)  She continued to insist that she did not pay Mr. Medina

to help him with the drive, but rather to "gift him this money" of $500 to $1,000,

and he was supposed to help her with driving.  (*Id.* at 61–62.)  She added that he

"has gifted me up to $5,000."  (*Id.* at 62.)

Government counsel impeached Ms. Rivera's testimony in part; Ms. Rivera

denied telling the Border Patrol agents that she had met Victor Gabriel at a party in

October or November but admitted telling agents that Mr. Medina had been out of

work and had multiple surgeries.  (*Id.* at 63–65.)  Government counsel then asked

again whether she recalled "that yesterday, you pleaded guilty to transporting illegal

aliens?"  (*Id.* at 65.)  The Court interjected that the question had been asked and

answered.  Government counsel then asked:

Q     Do you recall admitting to the elements of that offense?
A     Those are the ones that the judge read?

12

Q      Yes.

A      Yes.

Q      And you entered a guilty plea yesterday?

A      Yes, because of the clause that I wasn't gonna get deported because, you know, I've got my daughter.  I don't want to go back to my country.  It's not the same.

Q      So you admitted to transporting illegal aliens.

THE COURT: That has been asked and answered now twice.  You're not gonna get to ask it a third time.

(*Id.* at 65–66.)  The Court dismissed the jury for its morning recess and admonished the parties while the jury was not present:

THE COURT: Counsel, we are coming very close to unraveling the plea agreement in this case, so be very, very careful.  If I get a feeling that we have anything other than an unqualified admission of guilt in this case on all the elements, then I am going to reverse my decision accepting the plea agreement in this case, I will declare a mistrial, and I will reset this case for trial of both of these defendants together.

(*Id.* at 66.)  When the jury returned, Mr. Medina's counsel asked only one question on cross-examination: "You never told Miguel Medina that you were going to Montana to pick up illegal aliens, correct?"  (*Id.* at 67.)  Ms. Rivera replied, "Yes." (*Id.*)

The government then recalled Agent Oppelt.  (*Id.* at 69.)  He testified that Ms. Rivera told him she met Victor Gabriel at a party in October or November of 2021, and that they exchanged numbers and talked from time to time.  (*Id.* at 70.)  He further testified that Ms. Rivera told him that Mr. Medina had been out of work and had bills to pay, and that she offered him $1,000.  (*Id.* at 72–73.)  On cross-examination, he acknowledged that his report did not state that Mr. Medina was

13

present when Ms. Rivera and Victor Gabriel met to discuss the trip, that Gabriel

entered any data into any device possessed by Mr. Medina, or that there was any

indication that Gabriel had any communication with Mr. Medina.  (*Id.* at 75–76.)

The United States then called Brandon Wells, a Border Patrol intelligence

agent out of the Spokane Sector.  (*Id.* at 78.)  He was asked to assist with conducting

interviews of Ms. Rivera and Mr. Medina.  (*Id.* at 79–80.)  He testified that Mr.

Medina was Mirandized in English, which Mr. Medina stated was his preferred

language.  (*Id.* at 80–81.)  He then provided the following testimony:

> Q      So then what did he tell you after he was Mirandized?
> A      He stated that he was asked by his friend -- do you want me to
> state the name?  I don't know if I'm allowed to.
> Q      Yes.
> A      Oh.  Leslie Rivera.  He was asked by her to go on a trip to
> Yakima, Washington where they were gonna explore the area.  He
> further stated that when they either got to Yakima or in the area of
> Yakima, they then proceeded to go to Eureka, Montana.  He stated he
> didn't ask any questions about why they were heading there.  They
> never discussed that.  He just was along for the ride.
>
> He further stated that they had taken a nap somewhere along the
> highway on the road and that in the early morning hours of January 19,
> he was in an unfamiliar wooded area.  Again, had never asked Ms.
> Rivera what they were doing there.
>
> And he stated that he had seen multiple people kind of come out
> of the wood line into the headlights of the vehicle and that they just
> approached the vehicle and entered the vehicle.  Again, he stated that
> he never asked her any questions about who these people were, why
> they were there.
>
> And then he stated -- he told us that he was never paid from her;
> he was just along for the ride.  But then kind of at the conclusion of the
> interview, I asked him, if we were to look into his cell phone, are we
> gonna see any text messages or phone calls between them?  He told us
> that, yes, if we, if we look in his phone, we're gonna see a message

> from her telling him that he -- she has an opportunity to make some
> money, because she knows that he's been out of work for a long time,
> and he even stated that he needs the money.
>
> So that was essentially the basis of our interview.

(*Id.* at 81–83.)  On cross-examination, Mr. Medina's counsel elicited that Agent

Wells and Oppelt did not record the interview with Mr. Medina even though they

had cell phones with recording capability available, but they did record their

subsequent interview with Ms. Rivera using what Agent Wells believed to be a cell

phone Agent Oppelt produced.  (*Id.* at 84–85.)  The government rested, and the Court

excused the jury for a brief recess.  (*Id.* at 95.)  Mr. Medina's counsel moved for a

judgment of acquittal under Rule 29, and the parties presented argument; the Court

denied the motion, stating that "my impression is that the government's case is on

life support, but I think there's enough here to allow this case to go to the jury.

Barely."  (*Id.* at 96–102.)  Defense counsel elected not to present a case.  (*Id.* at 103–

04.)

After deliberating for several hours, the jury reached a verdict of guilty on

count 3 and was unable to reach a verdict on count 1.  (Doc. 126 at 155–170.)  The

Court declared a mistrial on count 1.  (*Id.* at 166.)

## DISCUSSION

### I.    Motion for Judgment of Acquittal

In ruling on a motion for judgment of acquittal pursuant to Rule 29 of the

Federal Rules of Criminal Procedure based on sufficiency of the evidence, the Court

must "review the evidence presented against the defendant 'in the light most favorable to the government to determine whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Freter*, 31 F.3d 783, 785 (9th Cir. 1994) (quoting *United States v. Shirley*, 884 F.2d 1130, 1134 (9th Cir. 1989)).  "[T]he government does not need to rebut all reasonable interpretations of the evidence that would establish the defendant's innocence, or rule out every hypothesis except that of guilt beyond a reasonable doubt."  *United States v. Katakis*, 800 F.3d 1017, 1023 (9th Cir. 2015) (quoting *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010)).  "That said, 'evidence is insufficient to support a verdict where mere speculation, rather than reasonable inference, supports the government's case, or where there is a total failure of proof of a requisite element.'"  *Id.* (quoting *Nevils*, 800 F.3d at 1167).

According to the Ninth Circuit's Model Criminal Jury Instructions, the elements of the crime of transportation of illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) are:

> First, [name of alien] was an alien;
> Second, [name of alien] was not lawfully in the United States;
> Third, the defendant knew or acted in reckless disregard that [name of alien] was not lawfully in the United States; and
> Fourth, the defendant knowingly transported or moved [name of alien] to help him or her remain in the United States illegally. . . .
>
> A person acts with reckless disregard if: (1) the person is aware of facts from which a reasonable inference could be drawn that the alleged alien was in fact an alien in the United States unlawfully; and (2) the person

16

actually draws that inference.

Model Crim. Jury Instr. 9th Cir. 7.2 (2022).

"The elements necessary to convict an individual under an aiding and abetting theory are (1) that the accused had the specific intent to facilitate the commission of a crime by another, (2) that the accused had the requisite intent of the underlying substantive offense, (3) that the accused assisted or participated in the commission of the underlying substantive offense, and (4) that someone committed the underlying substantive offense." *United States v. Gaskins*, 849 F.2d 454, 459 (9th Cir. 1988).

Mr. Medina "does not dispute that he was a passenger in a vehicle that was found to contain six individual aliens who were not lawfully in the United States" and stipulated that he was in the passenger seat of the vehicle driven by Ms. Rivera when the aliens entered the car and was still in the passenger seat when they were stopped by border patrol minutes later, but he contends that the evidence adduced at trial was insufficient to convict him under count 3.  (Doc. 128 at 9–10.)  The United States responds that Mr. Medina's motion "ignores the depth of circumstantial evidence against him" produced at trial and the reasonable inferences that must be drawn in favor of the jury's verdict.  (Doc. 134 at 14.)

## A.    Actus Reus

Mr. Medina argues that the United States' "sole theory of Medina's liability

17

for the transportation charge was that he aided and abetted Rivera in transporting illegal aliens[,]" but the government "presented no evidence that Medina *did* anything other than sit in the passenger seat of [Rivera's] vehicle[,]" and that "this is insufficient as a matter of law to support a conviction for aiding and abetting." (Doc. 128 at 10.)  He argues that the Ninth Circuit has held that "simply being a passenger in a vehicle is insufficient to establish aiding and abetting, even when the passenger knows others in the vehicle are involved in criminal activity." (Doc. 128 at 11.)  He acknowledges that the United States introduced evidence that, according to Rivera, "Medina was 'supposed to drive' at some point[,]" but argues that this is not a sufficient affirmative act for aiding and abetting liability.  (Doc. 128 at 13.)

As a threshold matter, the United States disagrees that its sole theory of liability was that of aiding and abetting; it argues that "[b]ecause Medina was actively involved in transporting the individuals not lawfully in the United States, sufficient evidence supported his conviction for the substantive count of transportation."  (Doc. 134 at 15 n.2.)  In any event, however, the United States emphasizes that "Medina was originally scheduled to drive, until it was discovered that he had problems with his license" and that he "was also there to ensure everything ran smoothly with the vehicle, including if a tire blew while driving remote roads in the Montana backcountry."  (*Id.* at 14–15 (citing Doc. 126 at 198).) The United States contends that these facts alone are sufficient to establish his

criminal liability but also notes that Rivera was going to pay him.  (*Id.* at 15 (citing Doc. 126 at 199–200).)  Mr. Medina disputes this characterization of the evidence, arguing that he was merely a passenger and took no part in operating the vehicle, and asserting that there is no evidence that Rivera informed him that she intended for him to drive or wanted him to be present in case she experienced car troubles, let alone evidence that he agreed to accompany her for those purposes.  (Doc. 138 at 2 n.1, 5–6.)

Mr. Medina's "mere presence" argument relies heavily on two Ninth Circuit cases.  In the first, the court reviewed a decision by the Board of Immigration Appeals affirming an Immigration Judge's determination that a citizen of Mexico, who was residing in the United States pursuant to a grant of parole pending final resolution of her immediate relative visa petition filed by her husband, was inadmissible because she engaged in alien smuggling in violation of 8 U.S.C. § 1182(a)(6)(E)(i).  *Altamirano v. Gonzales*, 427 F.3d 586, 588 (9th Cir. 2005).  The court held that the petitioner's "mere presence in [a] vehicle at [a] port of entry does not constitute alien smuggling [under the statute] despite her knowledge that an alien was hiding in the trunk of the vehicle."  *Id.*  At her removal hearing, the petitioner and her husband testified that they decided to return to California from Mexico to retrieve their daughters' birth certificates so that their daughters could reenter the United States, and the petitioner needed to accompany him because she knew where

those documents were located. *Id.* at 590.   The petitioner had admitted to immigration officers that her husband had told her the night before their travel of her father-in-law's plan to smuggle the alien into the United States and that she knew the alien was in the trunk of the car when she got into the vehicle. *Id.*  Based on that evidence, the Immigration Judge had found that "her involvement in the smuggling attempt was limited to her knowledge that [the alien] was in the trunk of the vehicle and her presence in the vehicle during the primary and secondary inspections." *Id.* at 590.  The court disagreed, holding that the statutory language at issue, which stated that "[a]ny alien who at any time knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law is inadmissible," 8 U.S.C. § 1182(a)(6)(E)(i), "requires an affirmative act of help, assistance, or encouragement," and the petitioner's presence in the vehicle was insufficient. *Altamirano*, 427 F.3d at 592.  The court noted that its conclusion "is buttressed by the well-established meaning of aiding and abetting[,]" and "[a] defendant cannot be convicted of aiding and abetting absent an affirmative act of assistance in the commission of the crime"; "[t]he prosecution must prove that 'the defendant was a participant, and not merely a knowing spectator.'" *Id.* at 594–95 (quoting *United States v. Gaskins*, 849 F.2d 454, 460 (9th Cir. 1988)).  The court rejected the government's argument that the petitioner's presence in the car "provided an air of normalcy and legitimacy that assisted in

20

ensuring [the alien's] illegal entry," because the Immigration Judge did not rely on this reasoning, there was no evidence that her or anyone's presence would make immigration officers less suspicious, and there was no evidence that immigration officers knew that the petitioner and her husband regularly made trips from the U.S. to Mexico. *Id.* at 595.

Both this case and Mr. Medina also rely on *United States v. Sanchez-Mata*, 925 F.2d 1166 (9th Cir. 1991), in which the court held that the government failed to present sufficient evidence against a defendant to support a conviction of possession with intent to distribute narcotics on an aiding and abetting theory because the defendant was discovered as a passenger in a car carrying 141 pounds of marijuana in the trunk, but no marijuana was found inside the passenger compartment of the car, he was never seen touching the bags holding the marijuana, his fingerprints were not on the bags, he did not have a key to the car, and he was never observed with the co-defendants at any other time. *Id.* at 1167–70.  In sum, the court concluded that the defendant's "presence as a passenger in the car cannot support an aiding and abetting theory." *Id.* at 1169.

"Although the defendant offered evidence of his so-called 'mere presence' defense," the Court's task "is not to review matters of credibility and assess the weight of the evidence. . . .  Rather, [the Court] must give the government the benefit of the doubt and assume that the jury found its evidence, both direct and

circumstantial, to be credible." *United States v. Chavez-Palacios*, 30 F.3d 1290, 1294 (10th Cir. 1994). Viewing the evidence in the light most favorable to the government, the evidence against Mr. Medina distinguishes this case from the authorities he relies on. The United States presented sufficient evidence that Mr. Medina was not a mere passenger. Mr. Medina told Border Patrol agents that he received a text message from Ms. Rivera offering him a way to make some money, and that he agreed to go with her to explore Yakima, Washington—approximately two-and-a-half hours away—but did not ask her any questions when they drove throughout the night to an icy, isolated road in northwest Montana in January at approximately 5:00 a.m., where six people emerged from the woods and entered their car. Ms. Rivera promised to give him $500 to $1,000, and, contrary to Mr. Medina's assertion that there was no evidence that he was aware of Ms. Rivera's intent in bringing him, she testified that she told him that he should come with her "in case a tire blew up or something was wrong with the car." (Doc. 126 at 57.) She also testified that Mr. Medina was supposed to drive, but she did not have him do so because he told her that his license was suspended; an obvious inference from this testimony is that Ms. Rivera and Mr. Medina had a conversation about him driving at some point before or during the trip. (*Id.* at 60–61.) This case is unlike *Altamirano*, in which the passenger's presence contributed nothing more than a purported "air of normalcy"; the United States presented evidence that Mr. Medina

22

was supposed to drive and that Ms. Rivera told him he would perform mechanical work on the car if needed.  A rational factfinder could find beyond a reasonable doubt that his presence not only assisted Ms. Rivera as she transported the aliens, but also constituted active participation in the transportation.  *Cf. United States v. Yoshida*, 303 F.3d 1145, 1151–52 (9th Cir. 2002) (interpreting "brings to" element of 8 U.S.C. § 1324(a)(2)(B)(ii) to not require control over method of transportation and concluding that "[t]he fact that [defendant] did not actually pilot the airplane . . . is of little consequence" where defendant escorted aliens onto airplane and accompanied them on flight);  *Herrera v. United States*, 208 F.2d 215, 218 n.4 (9th Cir. 1954) ("The verb 'transport' is defined by [Webster] as: 'To convey; esp., to carry or convey from one place or station to another, as by boat or rail; to transfer; as, to transport goods or troops.'").

### B.    Mens Rea

Mr. Medina argues that the United States failed to prove that he had the criminal intent necessary to commit the offense of transporting illegal aliens or of aiding and abetting Ms. Rivera's commission of that offense.  (Doc. 128 at 10.)  In particular, he contends that aiding and abetting requires foreknowledge of a criminal plan and specific intent to assist in its completion.  (*Id.*)  He also asserts that the Ninth Circuit "has repeatedly held that 'to convict a person of violating [8 U.S.C.] section 1324(a)(1)(A), the government must show that the defendant acted with

23

criminal intent, i.e., the intent to violate United States immigration laws.'"  (Doc. 128 at 13 (quoting *United States v. Yoshida*, 303 F.3d 1145, 1149 (9th Cir. 2002)).) The Court notes that the mens rea elements of Mr. Medina's offense of conviction, which require knowledge that the alien was illegal and intent to further the alien's illegal presence in the United States[1], satisfy this criminal intent requirement. *United States v. Barajas-Montiel*, 185 F.3d 947, 953–54 (9th Cir. 1999).

He argues that to form requisite intent for aiding and abetting liability, an accomplice "must have *advance knowledge* of the crime."  (Doc. 128 at 14.)  He relies on Rivera's testimony that she did not know she had been hired to transport illegal aliens and that she never told Medina the purpose of the trip, and he argues that the United States' theory that they should have had advance knowledge based on the circumstances of the pickup does not apply to Medina because he was not given GPS coordinates or instructions for the pickup.  (*Id.* at 14–15.)  He argues that the government's reliance on Medina's alleged statements to border patrol agents that he agreed to accompany Rivera to Yakima and did not ask any questions when she continued to drive to Montana as evidence of consciousness of guilt requires too much speculation to support a finding beyond a reasonable doubt that Medina had

---

[1] Mr. Medina does not raise any argument directly asserting that the "in furtherance" element was not met in this case; movement away from the United States' border can suffice to prove that element, which was not disputed here.  *See United States v. Hernandez*, 327 F.3d 1110, 1113 (10th Cir. 2003).

foreknowledge of a plan to transport illegal aliens and intended to aid Rivera in completing that plan.  (*Id.* at 15–16.)  He concedes that a rational juror may have concluded that he inferred that the aliens were in the United States illegally during or after the pickup, but argues that this is insufficient to establish the mens rea necessary for a conviction under an aiding or abetting theory of liability.  (*Id.* at 16.)

Again, the Court notes that the United States disagrees that its sole theory of liability was that of aiding and abetting, but the United States argues that it need not present direct evidence of Mr. Medina's intent and the jury need not credit his statement that he did not know the purpose of the trip.  (Doc. 134 at 15 n.2.)  The United States argues that "[t]he evidence that Medina was . . . hired to accompany Rivera (and assist in any mechanical issues) to pick up and transport six Spanish-speaking individuals coming out of the winter darkness along the Montana-Canadian border, at a pre-determined time and GPS location, amply supports the conclusion that he intended to assist Rivera in her illegal transportation."  (*Id.*)  In reply, Mr. Medina argues that there is no evidence that he had any advance knowledge of Victor Gabriel's payment to Rivera, the location of the pickup site in northwest Montana, the timing of the pickup, or the fact that six people dressed in winter clothing would walk from the woods and enter the SUV after confirming in Spanish that Rivera was the driver.  (Doc. 138 at 3.)  Mr. Medina further argues that his allegedly false exculpatory statements to Border Patrol agents cannot suffice to convict him absent

other independent evidence.  (*Id.* at 8–9.)

While Mr. Medina is correct that there is no direct evidence—e.g., a confession—that he knew the purpose of the trip, there is ample circumstantial evidence to support an inference that he had the requisite mental state under either theory of liability.  The jury was not required to accept Ms. Rivera's testimony that she did not know the purpose of the trip and that she did not tell Mr. Rivera the purpose of the trip, even if it was not directly rebutted by the government.  *United States v. Ramirez-Jiminez*, 967 F.2d 1321, 1328 (9th Cir. 1992).  Viewing the evidence in the light most favorable to the government, a rational factfinder could find beyond a reasonable doubt that the reason Mr. Medina did not ask Ms. Rivera any questions when Ms. Rivera offered him money, when their supposed trip to Yakima became an overnight journey to a remote, icy area of Montana, or when six strangers emerged from a forest and piled into the car was because he had advance knowledge of a plan to transport illegal aliens and intended to assist her in its completion.  Additionally, a reasonable factfinder could have inferred from Rivera and Medina's conflicting stories to Border Patrol agents (and Rivera's evolving story at trial) that each defendant was conscious of guilt and attempting to minimize his or her culpability.  There was sufficient evidence as to Mr. Medina's mens rea to sustain the verdict.

## C.     Conspiracy

Mr. Medina argues that the United States failed to prove that he conspired with anyone to violate the law, as alleged in count 1, because his presence in the vehicle is insufficient evidence to establish a conspiracy.  (Doc 128 at 10.)   In particular, he argues that the United States did not present independent evidence of his knowledge of or participation in the alleged conspiracy.  (*Id.* at 16–18.)   The United States did not set forth any argument concerning the conspiracy charge. (Doc. 134 at 10 ("The jury convicted Medina of transporting illegal aliens, . . . so the United States will only address the evidence as it pertains to that charge.").)   Mr. Medina argues that the United States has effectively conceded that the motion is well-taken as to count 1 pursuant to Local Rule 7.1(d)(1)(B)(ii).  The United States' decision to not contest the motion as to count 1, taken in tandem with counsel's statement to the Court that "the United States is in the position of respecting what the jury's verdict is as to Count 3 and allowing the Court to declare a mistrial on Count 1" during argument following the jury's note that it reached an impasse as to count 1 (Doc. 126 at 163), indicates to the Court that the United States does not have an interest in pursuing a second trial against Mr. Medina on count 1.  Accordingly, the Court will grant the motion as to count 1.

## II.    Motion for New Trial

"A district court's power to grant a motion for a new trial is much broader

than its power to grant a motion for judgment of acquittal." *United States v. Alston*, 974 F.2d 1206, 1211 (9th Cir. 1992). The Court need not view the evidence in the light most favorable to the verdict, but rather may weigh the evidence and evaluate credibility of witnesses itself, and if the Court "concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." *Id.* at 1211–12 (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)).

Mr. Medina argues that, if the Court concludes that the evidence presented at trial was legally sufficient to support the verdict, the Court should exercise its discretion as the "thirteenth juror" to conclude that the evidence preponderated sufficiently against the verdict such that a serious miscarriage of justice has occurred. (Doc. 128 at 20.) In particular, he argues that a miscarriage of justice "is evident from the circumstances surrounding Rivera's change of plea and her subsequent testimony at Medina's trial." (*Id.*) He notes that (1) Rivera testified at trial that she pleaded guilty to avoid deportation; (2) despite her plea, she maintained ignorance of the unlawful status of the people she was hired to transport; (3) the factual basis of her plea was so tenuous that the Court warned of mistrial following her direct examination; and (4) as a result, Mr. Medina was "forced to choose

28

between fully exercising his Sixth Amendment right to confront an adverse witness, and his Fifth Amendment right to have his trial completed before the first jury empaneled to try him" while the United States was able to cast doubt on her testimony. (*Id.* at 20–21.)

In making this argument, Mr. Medina argues that Rivera's allocution establishes that "it is implausible that she could have formulated a criminal intent to violate the immigration laws of the United States" in the roughly fifteen minutes aliens were in her car before it was stopped by Border Patrol. (*Id.* at 21–22.) He further argues that she was not fully informed of the "practically inevitable" immigration consequences of her guilty plea, which thus renders her plea not fully knowing. (*Id.* at 22–23.) Mr. Medina clarifies in his reply brief that he does not seek to assert impropriety on Ms. Rivera's behalf, but rather "to illustrate that a miscarriage of justice occurred in his own trial." (Doc. 138 at 12.) But to the extent these arguments are posed to remind the Court of the circumstances of Ms. Rivera's guilty plea and testimony, the Court does not need reminding. In the Court's view, Ms. Rivera's trial testimony concerning the alleged offense was exceptionally cagey, and she had difficulty admitting responsibility for any of her actions; her credibility as a witness was tepid at best. The Court's analysis of the motion for a new trial rests in part upon this view of her testimony.

A brief recap of the circumstances leading up to the Court's mistrial

admonishment is warranted.  Counsel for the United States repeatedly asked Ms. Rivera whether she had pleaded guilty to transporting illegal aliens, and each time, Ms. Rivera qualified her "yes" with a explanation—"because I had them in the car" and "because of the clause that I wasn't gonna get deported" (Doc. 126 at 52, 65–66)—and government counsel inexplicably continued to pose the same question, even after the Court twice interjected that the question had been asked and answered (*id.* at 65–66).

At this point, Ms. Rivera's credibility was in tatters; in the Court's view, she was obviously genuinely terrified of the possibility of being removed from the United States, and the tenor of her testimony reflected desperation to minimize her culpability despite the strength of the evidence against her and her guilty plea.  The United States had already effectively impeached her trial testimony about the offense conduct by presenting evidence of her prior inconsistent statements to Border Patrol agents immediately after her arrest.  Government counsel nevertheless asked Ms. Rivera multiple times to confirm that she had pleaded guilty to transporting illegal aliens, and with each response, Ms. Rivera offered additional explanations for pleading guilty that minimized her unlawful conduct and attempted to shift blame for her guilty plea to the passengers or to the potential consequences of conviction. The United States' repetitive questioning added nothing to its case, disregarded the Court's interjection that the question was asked and answered, and appeared to be

causing Ms. Rivera significant growing distress with each slight rephrase.  In the Court's view, Ms. Rivera had honestly, knowingly, and voluntarily pleaded guilty the day prior, but each time she was reminded of her criminal conduct on the stand, she became more desperate to minimize her responsibility, even though she did not do so credibly.  Whether her difficulty admitting responsibility arose from cognitive dissonance or fear of punishment is irrelevant.  From the Court's perspective, the Court's warning to the parties to be "very, very careful" was an admonishment to stop asking the same question about whether she pleaded guilty because her pattern of minimization was trending toward outright denial of guilt, and even though the Court would have found such denial entirely incredible, it would have necessitated a mistrial and further proceedings regarding her change of plea.

Mr. Medina argues that he was forced to choose between his constitutional rights to confront Ms. Rivera as a witness against him and to have his trial completed before the first jury empaneled to try him.  (Doc. 128 at 24–26.)  In particular, he argues that he "believes that a thorough cross-examination of Rivera, including exploration of her own *mens rea* and the reasons for her guilty plea, would have led to exculpatory testimony regarding his own involvement.  Per the Court's admonishment, however, such questioning would have resulted in a mistrial[,]" so he chose not to cross-examine Rivera beyond one question to avoid giving the United States another opportunity to try its case against him.  (*Id.* at 25.)

As the United States correctly notes, the Confrontation Clause guarantees only an opportunity for effective cross-examination, not cross examination that is effective in whatever way the defense might wish. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). Mr. Medina responds that the right "includes the right to confront a testifying alleged accomplice about the circumstances of the offense and the reasons for her guilty plea." (Doc. 138 at 11.) Mr. Medina's motion and reply brief concede that he made the strategic decision to avoid asking questions that might lead to a mistrial because he, like the Court, perceived that the government's case was weak. (Doc. 128 at 7, 25; Doc. 138 at 12.) In reply, however, he argues that Ms. Rivera's trial testimony did not create manifest necessity for a mistrial and retrial because it was not perjurious, but rather was consistent with the statements she made during her change of plea hearing, and the Court's concern was not perjury but rather whether Rivera had made an unqualified admission of guilt. (Doc. 138 at 11.)

Mr. Medina is correct that he was entitled to cross-examine Ms. Rivera, but the Court's admonition was in no way intended to artificially limit the permissible bounds of his cross-examination, and the subjects of "thorough cross-examination" he proposes—her mens rea and the reasons for her guilty plea—had already been established at that point of the trial. She had already testified that Victor had told her to go to Montana "to pick up a family who was coming from New York," that

she asked Mr. Medina to accompany her in case of mechanical issues, and that she pleaded guilty because the aliens were in the car with her and because she did not want to be deported and separated from her daughter.  On cross-examination, she testified that she never told Mr. Medina that she was going to Montana to pick up illegal aliens.  The story she told at trial was that she was a naïve driver-for-hire who wanted to give her friend $500 to $1,000 for his company and possible roadside assistance on an impromptu overnight trip to pick up passengers in rural Montana in mid-winter, and she pleaded guilty because she was caught with illegal aliens in her car and the plea agreement might allow her to avoid deportation.  While the Court does not doubt that her fear of deportation was real, her story of the offense conduct was incredible.  Further testimony that she had no knowledge that the purpose of the trip was to pick up illegal aliens would be extraordinarily unlikely to change the outcome as to Mr. Medina, because she already testified that she never told *him* the purpose of the trip.  The jury plainly did not credit that testimony, and neither does the Court.

Mr. Medina admits that his limited cross-examination was strategic.  (Doc. 128 at 7, 25; Doc. 138 at 12.)  He did not object to the Court's mistrial admonition. (Doc. 126 at 66.)  Despite the Court reminding the parties at the final pretrial conference that "I am available to you at any point in time during the trial, outside the presence of the jury, to discuss any issue that you have concerns about.  All you

need to do is let [my courtroom deputy] know or let . . . my law clerk[] know, and I'll come down during a break, over the noon hour, at the end of the day, first thing in the morning, and make myself available to you if you want to discuss something" (Doc. 125 at 24–25), Mr. Medina did not seek clarification of the Court's intent or meaning before, during, or after the recess taken immediately afterward. (Doc. 126 at 66.) Rather, his counsel made a strategic call to proceed with limited cross-examination that proved unsuccessful, and he now argues that he did so under constitutional duress. The Court cannot agree. Even if the Court had not warned counsel of the direction Ms. Rivera's distraught testimony appeared to be heading, the possibility of a mistrial that was beyond the government or the Court's control was looming. Mr. Medina would have confronted the exact same strategic choice of how far he could or should press Ms. Rivera on cross-examination at the risk of dismantling her guilty plea irrespective of the Court's warning. To be sure, Mr. Medina's double jeopardy right protects him from retrial in the event that the government or the Court deliberately throws the case or in the absence of manifest necessity. *Oregon v. Kennedy*, 456 U.S. 667 at 671–72, 675–79 (1982). But it does not protect him from a retrial in the event of a recalcitrant witness's mid-trial disavowal of her previously admitted guilt. If that had occurred, the Court could not have allowed Ms. Rivera's guilty plea to stand and proceeded with trial without committing "obvious procedural error" all but guaranteeing appellate reversal,

which establishes manifest necessity. *Illinois v. Somerville*, 410 U.S. 458, 464 (1973). Had Mr. Medina elicited testimony from Ms. Rivera fatally undermining her guilty plea, the Court is at a loss to offer an alternative remedy to a mistrial because the jury had already been informed of her admitted guilt, which likely influenced their perception of her credibility; a mid-trial rejection of her guilty plea would suddenly cloak her in the presumption of innocence while quite possibly worsening her credibility in the eyes of the jurors, to Mr. Medina's prejudice, based on recanting her previous admission of guilt. *See United States v. Grasso*, 600 F.2d 342, 345–46 (2d Cir. 1979) (affirming district court's decision to grant mistrial based in part on potential jury confusion and prejudice caused by witness's "sensational" testimony, recantation of said testimony, and evidence that witness retracted recantation). For all of these reasons, the Court is not persuaded that its admonition improperly forced Mr. Medina to choose between his right to cross-examine Ms. Rivera and his right to be protected from double jeopardy.

Likewise, based on the Court's presence at trial and review of the transcripts, the Court is not persuaded that the evidence presented preponderates sufficiently heavily against the verdict that the Court should exercise its discretion as the "thirteenth juror" to vacate the verdict and grant a new trial. In considering Mr. Medina's Rule 29 motion at the close of the government's case, the Court stated, "having listened to the same evidence that the jury has heard, my impression is that

the government's case is on life support, but I think there's enough here to allow this case to go to the jury.  Barely."  (Doc. 126 at 102.)  This statement accurately reflected the Court's view in that moment.  However, after hearing closing arguments and considering the evidence as a whole, both during and after the jury's deliberations, the Court has concluded otherwise.

Consider the evidence in a typical criminal case prosecuted before this Court; a defendant is discovered to have pounds of methamphetamine in duffel bags in the back seat of his car during a traffic stop, or a felon's fingerprints are found on a rifle located in his bedroom closet during a probation officer's home search.  Relatively speaking, the case against Mr. Medina is highly circumstantial; he did not confess to Border Patrol agents, he did not speak to the aliens in the car, and there was no evidence introduced of text messages or other recorded conversations concerning the trip between him and Ms. Rivera.  However, as the Court instructed the jury, "[t]he law makes no distinction between the weight to be given to either direct or circumstantial evidence" (Doc. 126 at 124), and the circumstantial evidence in this case is compelling.  Although this offense is not the crime of the century, the evidence does not preponderate in favor of a finding that Mr. Medina was naively providing company for Ms. Rivera aboard an innocent shuttle service for pedestrian tourists in the Montana wilderness at 5:00 a.m. in mid-January, for which both he and Ms. Rivera were to be well compensated.  In light of the circumstances in which

he was arrested, his attempted exculpatory statements to Border Patrol agents—particularly his apparent lack of concern or questions for Ms. Rivera about the fact that a short road trip to Yakima transformed into an overnight drive to icy forest roads in Montana, where six strangers piled into the car—simply defy common sense. Viewing the evidence as a whole, the jury's verdict of guilty on count 3 is not merely defensible; as the thirteenth juror, the Court finds that Mr. Medina's guilt beyond a reasonable doubt of transporting illegal aliens is the most reasonable conclusion that can be drawn from the evidence. The motion for a new trial will be denied.

## CONCLUSION

Accordingly, IT IS ORDERED that the motion for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure is GRANTED as to count 1 and DENIED as to count 3.

IT IS FURTHER ORDERED that the motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure is DENIED.

The Court will enter judgment accordingly after Mr. Medina's sentencing hearing.

37

DATED this 18th day of November, 2022.


Dana L. Christensen, District Judge
United States District Court